IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

KELVIN LORENZO CHAPMAN,

       Petitioner,

v.                                              CASE NO. 1:17-cv-179-TKW-GRJ

SECRETARY, FLORIDA DEP'T
OF CORRECTIONS,

       Respondent.

_____/

## **REPORT AND RECOMMENDATION**

This case is before the Court on Petitioner's Amended Petition for a
Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  ECF No. 7
("Petition").  The Petition stems from Petitioner's Alachua County conviction
for burglary of a dwelling while armed with a firearm, for which he is serving
a life sentence.  *Id.*  Respondent has filed a response and appendix with
relevant portions of the state-court record, and Petitioner has filed a reply.
ECF Nos. 17, 24.   Upon due consideration of the Petition, the response,
the reply, and the state-court record, the undersigned recommends that the
Petition be denied.[1]

_____

[1] The Court has determined that an evidentiary hearing is not warranted because
the Court may resolve the Petition on the basis of the record. *See* Rule 8, Rules
Governing Habeas Corpus Petitions Under Section 2254.

# I. <u>State-Court Proceedings</u>

Petitioner and two co-defendants, Keith Lamar Hopkins and Johnny Jerome Nobles, were charged by a second amended information with armed burglary of a dwelling. ECF No. 17-1 at 95-96.   The information alleged in Count I that on July 6, 2012, the three men committed a burglary at a dwelling occupied by Shahidah Muwwakkil and Robert Armstrong. *Id.* Count I further alleged that in the course of committing the burglary, Hopkins and/or Petitioner used, possessed, and discharged a firearm. Count II charged Keenan Javar Jackson and Tameka S. Johns as accessories after the fact.  Count III charged Hopkins with being a felon in possession of a firearm, and Count IV charged Nobles with shooting at or into or throwing a stone or other hard substance into a dwelling. *Id.*

 On June 10, 2013, the day the case was set for trial, the State filed notices of intent to seek enhanced penalties, alleging that Petitioner qualified for sentencing as a prison releasee reoffender ("PRR") under Fla. Stat. § 775.082(9) and as a "10/20/Life Offender" under Fla. Stat. § 775.087(2). [2] *Id.* at 93-94.  Petitioner, through counsel, entered written

---

[2] A "prison releasee reoffender" is, *inter alia,* someone who commits a designated "life felony" (including burglary of a dwelling and armed burglary) within three years of being released from incarceration for committing an offense for which the sentence is more than one year.  If a person is convicted of a life felony and qualifies as a PRR, then the PRR statute mandates a sentence of life imprisonment.  Fla. Stat. § 775.082(9).  Florida's "10/20/Life" statute establishes minimum mandatory sentences for offenses involving the use of a firearm during the commission of a forcible felony,

stipulations that prior to the date of the offense he had been convicted of a

felony and that he previously was released from the Department of

Corrections on March 14, 2011.  *Id.* at 97-98.

The evidence adduced at the one-day trial may be summarized as

follows.  Shahidah Muwwakkil testified that she and her boyfriend, Robert

Armstrong, were asleep in the bedroom of her unit at Holiday Gardens

Apartments in the early morning hours of July 6, 2012.  Two other people

were asleep in the living room.  Muwwakkil was awakened when a "huge"

rock came through a sliding glass door that opened onto a porch from the

bedroom.  Muwwakkil sat up and started screaming.  Armstrong, whom she

described as a heavy sleeper, did not immediately awaken.  The light from

a motel behind the building allowed Muwwakkil to see a person wearing a

red shirt.  She could see an arm protruding through the hole and holding a

black gun.  The person with the gun was wearing a black shirt.  A voice

said "get up, fat a--, give me all your money."  The person discharged the

gun and the bullet struck the bedroom wall behind Muwwakkil.  ECF No.

17-1 at 280-91, 296-97.

On cross-examination, Muwwakkil testified that she described the

gun as a "shotgun" to police.  She estimated that 10 minutes passed

_____

including burglary.  Fla. Stat. § 775.087(2).

between the rock coming through the window and the gunshot.  Armstrong woke up after the gunshot.  Muwwakkil could not see the faces of the people outside the glass door because the door was covered with vertical blinds.  Muwwakkil admitted that she did not know who broke the glass door or who fired the shot.  *Id.* at 291-96.  On redirect, Muwwakkil again stated that the gun was a shotgun, but explained that she is not a gun expert.  *Id.* at 298.

Robert Armstrong testified that on the night of the incident he was awakened by Muwwakkil screaming.  He did not see who threw the brick, nor did he hear the gunshot.  He saw the bullet hole in the wall after the police arrived.  *Id.* at 300-03.  On cross-examination, Armstrong conceded that he only heard Muwwakkil screaming and he agreed that he did not know if they were burglarized at all.  He admitted that he knows Keith Hopkins.  *Id.* at 306-07.  On redirect, he further admitted that he used to deal drugs with Hopkins.  Armstrong refused to say whether he had marijuana in the apartment on the night of the incident.  *Id.* at 307.

Gainesville Police Department Officer James Lake testified that he responded to Muwwakkil's apartment the night of the incident.  Neither Armstrong nor Muwwakkil could identify who threw the brick through the window or who shot the gun.  In the course of his investigation, Lake recovered a .22 caliber shell casing from the bedroom and observed the

bullet hole in the wall.  The victims confirmed that those items had not been

in the bedroom previously.  *Id.* at 309-16.

GPD Forensic Crime Unit Investigator Marc Woodmansee was called

to investigate the scene.  He could see that a large chunk of concrete had

been thrown through the glass door.  He located the shell casing and bullet

hole in the bedroom and took photos of the scene.  Woodmansee

recovered the bullet from the wall by cutting away the wallboard.  He

identified the bullet and the casing, which were contained in sealed

evidence bags bearing his initials.  He believed the bullet was a "long-rifle"

round.  He swabbed the casing, but it was never submitted for DNA

analysis.  Two days later, Woodmansee and an evidence technician,

Investigator Bunevich, responded to a different apartment where a firearm

had been recovered.  *Id.* at 316-24.

GPD Detective Tom Mullins testified that he received a call from an

Alachua County Sheriff's Office deputy stating that he was with a woman,

Tameka Johns, who had information about a suspect and a gun used in a

robbery.  Mullins met with Johns, who was in custody for something else,

and read her the *Miranda* warnings.  Johns agreed to speak with Mullins.

In a sidebar conference, Petitioner's defense counsel, John Ramsey,

objected on hearsay grounds.  The Court overruled the objection and

offered to instruct the jury that Mullins' statements about Johns were not

offered as evidence of anything but only to explain what actions Mullins took and why.  At counsel's request, the Court so instructed the jury.  ECF No. 17-2 at 1-5.

Tameka Johns provided Mullins with information about people she believed were involved in the burglary, including a person named "Keith" that Mullins later determined was Keith Hopkins.  She described another person with long dreadlocks and a third person that she knew as the son of a man nicknamed "Hulk".  After first sending the investigators to a different residence, Johns eventually admitted that she had the gun in her possession at her apartment.  She gave consent to a search and told Mullins where to find the gun.  Mullins testified that the gun was a black .22 caliber Browning long-rifle semiautomatic pistol.  He described the gun as "long and slender" and stated that he had never seen one that "skinny".  *Id.* at 6-13.

GPD Officer Andrew Bunevich testified that he was a police service technician working under Investigator Woodmansee when the burglary was investigated.   Bunevich photographed Tameka Johns' apartment and collected the firearm.  The weapon was dusted for fingerprints and photographed at the forensic unit.  No fingerprints were recovered.   ECF No. 17-2 at 14-25.

A Florida Department of Law Enforcement (FDLE) crime laboratory

analyst, Laura Draga, testified as an expert on the science of firearms and firearm analysis. Draga was asked to examine a .22 long-rifle caliber semiautomatic pistol, a fired cartridge case, a fired bullet, some cartridges, and a magazine. She also performed a test-firing of the weapon and compared the fired bullets with the bullet recovered at the crime scene. Draga could not determine whether the recovered bullet was fired by the weapon. However, Draga opined that based on her analysis the cartridge recovered from the crime scene was fired in the submitted firearm. ECF No. 17-2 at 33-47. On cross-examination, Draga conceded that there is no such thing as "exact science", but explained that her error rate on proficiency tests in performing such comparisons was zero percent. *Id.* at 48-61.

Johnny Nobles testified as a witness for the State. At the time of trial, Nobles was nineteen years old and an Alachua County Jail inmate. Nobles testified that he had entered an open plea to the charge of throwing a rock into the victims' apartment, with no promise from the State regarding his sentence. ECF No. 17-2 at 62-63.

Nobles testified that he knew Keenan Jackson and Keith Hopkins, but he did not meet Petitioner until the night of the burglary. Nobles was with Jackson when Jackson received a call from Petitioner "about a lick" (a robbery or burglary) involving drugs. Nobles agreed to go with Jackson to

meet Petitioner.  Nobles and Jackson took Jackson's red Honda to meet

Petitioner at Granada Apartments around 8:00 or 9:00 p.m.  Petitioner was

at "his baby mama house", and Nobles testified that the "baby mama" was

Tameka Johns.  Jackson called Petitioner when they arrived at Granada

Apartments, and Petitioner came out wearing a black t-shirt, black jeans,

and black shoes.  Petitioner directed Jackson to drive to a Steak N' Shake

where they would meet with Keith Hopkins.  *Id.* at 64-68.

Keith Hopkins joined them at the Steak N' Shake.  Nobles testified

that Hopkins "was the planner.  He planned the burglary."  Hopkins said

that he was friends with the victim, that the victim had pounds of marijuana,

and that the people inside the Holiday Gardens apartment where the victim

stayed were supposed to be out of town.  Nobles testified that he initially

told Detective Ettinger that he saw Hopkins with a shotgun, but he did so

because he was scared and he did not see Hopkins with a shotgun.   *Id.* at

69-70.

The men dropped Hopkins off at a nearby motel.  Hopkins did not

participate in the burglary but was supposed to receive a share from the

crime.  After dropping Hopkins off, Jackson drove Nobles and Petitioner to

an apartment complex near the victims' residence and parked the car.

Jackson's role was driver, and Nobles and Petitioner's roles were to "go in

the house and get the pounds."  At that point, Nobles had not seen a gun.

*Id.* at 70-73.

Nobles and Petitioner jumped a fence separating the apartment complexes and went to the back of the victims' residence. Nobles had a screwdriver. Nobles attempted to open a window with the screwdriver but was unsuccessful. Petitioner told Nobles that he might as well throw a brick through the glass door, and Nobles did so. Nobles then heard a female screaming. Nobles did not intend to go through with the burglary after he heard screaming, and tried to get Petitioner to leave but he did not listen. Petitioner pulled Nobles away from the door and produced a black semiautomatic pistol. Petitioner put his hand through the hole and told the people inside to "give me the money". He fired the gun one time. Nobles ran back to the car where Jackson was waiting, and Petitioner followed him. The men returned to the motel and then took Hopkins and Petitioner back to Granada Apartments. Jackson and Nobles went back to their neighborhood. *Id.* at 73-78.

Nobles was interviewed by Detective Ettinger the following month. He initially denied being involved, and then eventually told Ettinger that he accompanied Petitioner to commit the burglary. Nobles identified the firearm that was used in the burglary from a photograph provided by Ettinger, and testified that the firearm in the photograph was the one used by Petitioner to fire into the residence. *Id.* at 78-79.

On cross-examination, Nobles testified that Keith Hopkins was a friend of Nobles' father.  Ettinger interviewed Nobles while he was in jail, and Nobles agreed that Ettinger told Nobles "I need you to put him here," referring to Hopkins.  Nobles denied that he told Ettinger that Hopkins fired the gun.  Nobles testified that on the night of the burglary he and Jackson were dressed all in black.  Hopkins was wearing a black t-shirt and beige shorts.  Nobles admitted that he had been smoking marijuana all day on the day of the burglary.  *Id.* at 80-85.

Nobles admitted that when he was questioned about the gun he did not know what type it was, but he could describe it.  He also admitted that he initially lied and said that Hopkins forced him to throw a brick through the door.  Nobles was "scared" because "the detective kept saying Keith Hopkins".  He testified: "[b]ut everything I said about [Petitioner] was the honest truth.  He shot the gun."  Nobles told Ettinger about Petitioner's involvement.  Nobles lied to Ettinger about Hopkins because "I'm only 19, sir.  I'm thinking if I say something about him, he'll let me go home."  Nobles admitted that he had originally been charged with armed burglary.  The State Attorney allowed him to plead to a lesser offense.  Nobles denied that he would have said anything to get out of jail.  *Id.* at 90-100.

On redirect, Nobles reaffirmed that everything he said to Ettinger about Petitioner's role was the truth.  When he told Ettinger about Hopkins,

it was because Nobles was trying to minimize his own role in the burglary.

Nobles testified that no one forced him to do the burglary. He was 100%

positive that the gun he identified is the one he saw Petitioner shoot into

the residence. *Id.* at 100-103.

GPD Detective Blair Ettinger testified that he began investigating the

crime the morning after the burglary. Two days later, Detective Mullins

informed him about the firearm and the potential witness, Tameka Johns.

Ettinger testified that he believed Johns was Petitioner's girlfriend and that

they had a child together. Ettinger interviewed Johns, who described

details about the burglary. She described the weapon and provided leads

regarding who was involved. When counsel asked Ettinger if Johns

described the driver of the car, the court sustained defense counsel's

objection and again instructed the jury that statements about what Johns

said were hearsay that were only offered to explain Ettinger's actions. *Id.*

at 109-12.

Based on information provided by Tameka Johns, Ettinger

interviewed Keenan Jackson, Keith Hopkins, and Petitioner. Petitioner was

informed of his *Miranda* rights and agreed to speak with Ettinger. Ettinger

identified Petitioner in open court. Petitioner denied involvement in the

burglary but told Ettinger he was with Jackson and Hopkins that night.

Petitioner told Ettinger they were in a red Honda, and that they first went to

a CVS to pick up Hopkins, and then to a motel, and then Petitioner was dropped off at Granada Apartments.  Ettinger reviewed surveillance video from the CVS identified by Petitioner, and contrary to Petitioner's claim neither Petitioner nor anyone else related to the case was there on the night of the burglary.  *Id.* at 112-18.

Ettinger showed Petitioner a photo lineup.  Petitioner identified photos of Hopkins and Jackson.  After seeing the photos, Petitioner changed his story and told Ettinger that they had been at the Steak N' Shake parking lot near the scene of the burglary.  Petitioner stated that he saw a firearm in the backseat of the Honda, and that he heard a gunshot that night.  He told Ettinger that he found the gun in some bushes near the ABC Motel, and that he put the gun in Tameka Johns' apartment.  Ettinger canvassed the entire property of the ABC Motel and found no bushes.  *Id.* at 118-21.

Ettinger then interviewed Nobles.  Nobles originally denied involvement, but after Ettinger told him he would check his alibi Nobles said he wanted to be truthful.  During the first interview, Nobles indicated that both Petitioner and Hopkins were present at the scene of the burglary. Nobles told Ettinger he had seen Petitioner with the firearm used in the burglary, and identified a picture of the firearm.  The firearm had been recovered from a laundry basket in the apartment where Tameka Johns and Petitioner lived.  Nobles told Ettinger that Jackson's role in the crime

was driver, that Nobles threw a brick through the glass door, and that Petitioner shot the gun through the window. Ettinger testified that Petitioner admitted to him that he had possessed and hidden the firearm recovered from his apartment. *Id.* at 121-31, 146.

The State rested, and the court denied defense counsel's motion for a judgment of acquittal. The defense then rested, and the court conducted a colloquy with Petitioner regarding his decision not to testify. The court denied Petitioner's renewed motion for a judgment of acquittal. *Id.* at 147-53.

The parties approved the verdict form and then discussed the jury instructions. Petitioner's counsel agreed that the standard jury instruction on "principals" applied to the case, as well as an instruction on the lesser-included offense of trespass and a special finding regarding whether Petitioner was armed. After reviewing the other instructions, the court asked whether counsel wanted any other additions or changes to the instructions. Defense counsel stated "I believe it was sufficient, your Honor, for you to caution the jury on the hearsay issue twice[.]" *Id.* at 155-59.

During closing argument, the prosecutor referred to Tameka Johns and stated that Johns provided Ettinger with information that "only somebody who knows about the burglary would know. And she gets that

information because she's the defendant's girlfriend.  She's the mother of the defendant's child."  The court overruled defense counsel's objection. *Id.* at 169.

The prosecutor further argued to the jury that Petitioner could be found guilty as a principal to burglary based on telling Nobles to throw the concrete block through the door.  Alternatively, the prosecutor argued that the evidence showed that Petitioner himself entered the dwelling by putting his arm through the hole with a gun and demanding money.  He contended that the jury could make the special findings that Petitioner possessed and discharged a firearm based on Noble's testimony, the victim's description of the gunman's clothing, Petitioner's admission that he possessed and hid the firearm identified as the one used in the burglary, evidence that the shell casing found in the apartment was fired from the same gun, and evidence that the rounds still in the gun had the same manufacturing marks as the round found in the victims' apartment.  *Id.* at 174-78, 195.

Defense counsel's closing argument focused on discrediting Nobles' testimony and suggesting that Keith Hopkins, not Petitioner, committed the burglary with Nobles.  *Id.* at 185-91.

Following closing arguments, the court conferred with counsel regarding revisions that had been made to the verdict form with respect to the interrogatories on special findings.  The parties agreed that the revised

form was appropriate.  *Id.* at 196.

After deliberating for about an hour, the jury sent a question to the court asking for clarification of interrogatory 1E of the verdict form, requiring the jury to find whether Petitioner "was a principal to burglary with actual possession [of] a firearm."  *Id.* at 214; *see* ECF No. 17-1 at 110-11 (jury note and verdict form).  The jury asked "[h]ow does this compare to C and D on the same form?"  ECF No. 17-1 at 110; ECF No. 17-2 at 214. Interrogatory 1(C) required the jury to find whether Petitioner "was in actual possession of a firearm and actually discharged a firearm" during the burglary.  Interrogatory 1(D) required the jury to find whether Petitioner "was in actual possession of a firearm".  ECF No. 17-1 at 111.[3]

The court explained to the jury that interrogatories C and D required a finding of "actual possession" and repeated the definition of "actual possession".  As to interrogatory E, the court explained "it is principal theory, and I've defined a principal for you. . . . [Y]ou must find that the state proved beyond a reasonable doubt that the defendant was guilty as a principal to burglary with a firearm with actual possession, and a principal is defined for you in the instructions."  The court then repeated the jury

---

[3] Interrogatories 1(A) and (B) on the verdict form pertained to whether the structure was a "dwelling" and whether it was occupied by a human.  *See* ECF No. 17-1 at 111.

instruction on "principals":

> If the defendant helped another person or persons commit or attempt to commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person did if, number one, the defendant had a conscious intent that the criminal act be done and, number two, the defendant did some act or said some word which intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually commit or attempt to commit the crime. To be a principal, the defendant does not have to be present when the crime is committed or attempted.

ECF No. 17-2 at 216-17.

The jury returned a verdict of guilty of burglary, as charged in the information, with affirmative findings that the structure was a dwelling, another human being was in the structure, and that Petitioner was a principal to burglary with actual possession of a firearm (interrogatory 1E on the verdict form).  The jury did not find that Petitioner himself was in actual possession of a firearm or actually discharged a firearm.  *Id.* at 219.

At sentencing, the court noted that Petitioner had stipulated to facts that qualified him for sentencing as a prison releasee reoffender ("PRR"): that Petitioner had been convicted of an offense punishable by a term of more than one year prior to July 6, 2012; and that he had been released from the Department of Corrections on March 14, 2011.  The court nevertheless took evidence from the State regarding the PRR sentence. The state produced DOC records of Petitioner's incarceration and release,

a judgment and sentence reflecting a prior felony conviction on July 12, 2010, and documents establishing Petitioner's identity.  ECF No. 17-4 at 35-39.

The court found that the State's notice of sentencing enhancement was timely and that the State proved by a preponderance of the evidence that Petitioner was released from the DOC within three years of committing the new offense.  The court found that the new offense fell under the felonies enumerated in Fla. Stat. § 775.082 as qualifying offenses for a PRR sentence.  The court explained that if it had the discretion, it would have imposed a sentence of between 15 and 30 years.  Because Petitioner was convicted of a life felony, as a PRR designee the court could only impose a mandatory life sentence.  *Id.* at 40-42.

Petitioner appealed and while his appeal was pending he filed, through counsel, a motion to correct sentencing error pursuant to Fla. R. Crim. P. 3.800(b)(2).  Petitioner argued that the PRR statute violates *Apprendi v. New Jersey,* 530 U.S. 466 (2000) and *Alleyne v. United States,* 570 U.S. 99 (2013), because (1) the temporal relationship between the current offense and release from prison was determined by the judge rather than the jury; (2) the lack of statutory "extenuating circumstances" which "preclude" the "just" imposition of a PRR sentence was determined by the prosecutor rather than a jury; and (3) qualification as a PRR was

established by a preponderance of the evidence rather than beyond a reasonable doubt. Counsel also argued that neither Petitioner's status as a PRR nor the State's intention to seek a PRR sentence were timely alleged in the charging document. ECF No. 17-4 at 65-78.

The trial court denied the motion. The court explained that under *Almendarez-Torres v. United States,* 523 U.S. 224 (1998), the fact of a prior conviction is excepted from the rule that acts which increase the prescribed range of penalties must be found by a jury beyond a reasonable doubt. The court cited *Calloway v. State*, 914 So.2d 12, 15 (Fla. 2nd DCA 2005) for the proposition that the fact of a date of release from prison is based on a "prior conviction" and is not the type of fact that is subject to the safeguards of *Apprendi*. Based on the finding that *Apprendi/Alleyne* do not apply to release dates and prior convictions, the court found that the "PRR sanction is not a fact that has to be alleged in the charging document." ECF No. 17-4 at 80-81.

Petitioner's direct appeal raised three arguments: (1) the trial court erred in overruling Petitioner's hearsay objection to the statements of Tameka Johns; (2) the trial court erred in sentencing Petitioner to a mandatory minimum life term because the PRR statute violates *Apprendi* and *Alleyne*; and (3) the trial court erred in imposing a PRR sentence because neither his status as a reoffender nor the State's intention to seek

enhanced penalties were timely alleged in the charging documents.  ECF

No. 17-4 at 89-124.  The First DCA affirmed, *per curiam*, without written

opinion.  *Id.* at 185.

Petitioner filed a *pro se* motion for postconviction relief pursuant to

Fla. R. Crim. P. 3.850, asserting that his trial counsel was ineffective for

failing to argue against inclusion of a jury instruction on "principals", for

failing to object to an "ambiguous" verdict form, and for failing to properly

respond to hearsay testimony regarding Tameka Johns' statements.

Petitioner also argued that the prosecutor's improper closing argument

denied him a fair trial, and that the trial court made "cumulative errors."  *Id.*

at 207-34.  The postconviction court summarily denied the motion without

an evidentiary hearing, but entered an amended judgment and sentence to

correct erroneous citations in the original written judgment.  *Id.* at 353; ECF

No. 17-5 at 1-7.

Petitioner appealed, asserting the same claims raised in the trial

court.  ECF No. 17-5 at 145-75.  The First DCA affirmed, *per curiam,*

without written opinion. *Id.* at 178.

Petitioner then filed the instant federal habeas corpus petition.[4]

Petitioner asserts five grounds for relief: (1) the PRR sentence is

---

[4] Respondent concedes that Petitioner's federal claims were exhausted in state
court and that the Petition is timely.

unconstitutional under *Apprendi* and *Alleyne* because the relevant sentencing factors were not found by a jury beyond a reasonable doubt; (2) the State did not timely allege his PRR status or the State's intent to seek an enhanced sentence in the charging document; (3) Trial counsel was ineffective for not opposing a jury instruction on "principals" and for allowing the verdict form to reflect the principals theory; (4) Trial counsel was ineffective for failing to object to an ambiguous verdict form; and (5) Trial counsel was ineffective for failing to properly object to hearsay testimony.

## II.  Section 2254 Standard of Review

Under 28 U.S.C. § 2254(d)(2), a federal court may not grant a state prisoner's application for a writ of habeas corpus based on a claim already adjudicated on the merits in state court unless that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Under § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'"  *Burt v. Titlow,* 571 U.S. 12, 18 (2013) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

As to legal findings, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1); *see Burt*, 571 U.S. at 18-19 (standard for reviewing claims of legal error by state courts is "highly deferential"). This standard "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Id.*

This highly deferential standard carries special force in habeas cases asserting ineffective-assistance claims: "Especially where a case involves such a common claim as ineffective assistance of counsel under *Strickland*[5]—a claim state courts have now adjudicated in countless criminal cases for nearly 30 years—'there is no intrinsic reason why the fact that a man is a federal judge should make him more competent, or conscientious, or learned . . . than his neighbor in the state courthouse.'"

---

[5] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (holding that to prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate (1) that his counsel's performance was below an objective and reasonable professional norm, and (2) that he was prejudiced by this inadequacy. A court may dispose of the claim if a defendant fails to carry his burden of proof on either the performance or the prejudice prong).

*Id.* (quoting *Stone v. Powell*, 428 U.S. 465, 494, n. 35, 96 S.Ct. 3037

(1976)).

In view of the deference afforded to the state courts' adjudication of

constitutional claims, "AEDPA erects a formidable barrier to federal habeas

relief for prisoners whose claims have been adjudicated in state court.

AEDPA requires 'a state prisoner [to] show that the state court's ruling on

the claim being presented in federal court was so lacking in justification that

there was an error . . . beyond any possibility for fairminded disagreement.'"

*Id.* at 15-16 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "'If this

standard is difficult to meet'—and it is---'that is because it was meant to

be.'" *Id.* at 16 (quoting *Harrington*, 562 U.S. at 102). "We will not lightly

conclude that a State's criminal justice system has experienced the

'extreme malfunction' for which federal habeas relief is the remedy." *Id.*

(quoting *Harrington*, 562 U.S. at 102).

## III. Discussion

### Ground One: Whether Petitioner's Mandatory Life Sentence as a PRR is Unconstitutional Under Apprendi and Alleyne

Petitioner asserts that his mandatory life sentence under Florida's

PRR statute violates the Sixth and Fourteenth Amendments pursuant to

*Apprendi* and *Alleyne* because the relevant sentencing factors were not

found by a jury beyond a reasonable doubt.  ECF Nos. 7, 24.

In *Apprendi*, the Supreme Court held that "*[o]ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury and proved beyond a reasonable doubt." 530 U.S. at 489 (emphasis added). The Supreme Court later held in *Blakely v. Washington,* 542 U.S. 296, 303-05 (2004) that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." 542 U.S. at 304.

In *Alleyne,* the Supreme Court extended the *Apprendi* and *Blakely* rationales, holding that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." 570 U.S. at 103.[6]   The Supreme Court expressly acknowledged in *Alleyne*, however, that it was not revisiting the narrow exception set forth in *Almendarez-Torres*, which held that for sentencing enhancement purposes, a defendant's prior

---

[6] In *Alleyne* the issue was whether the jury was required to find that the petitioner brandished a firearm during and in relation to a crime of violence to increase his mandatory minimum sentence for robbery under 18 U.S.C. § 924(c)(1)(A). *Id.* at 103–04. In that case, upon convicting petitioner, the jury indicated on the verdict form that petitioner had used or carried a firearm during and in relation to a crime of violence, but did not indicate a finding that the firearm was brandished. 570 U.S. at 104. The sentencing court, however, concluded that brandishing was a sentencing factor that the court could find by a preponderance of evidence. *Id.* The sentencing court subsequently found that petitioner brandished the firearm and sentenced petitioner to seven years' imprisonment pursuant to § 924(c)(1)(A)(ii), instead of the five-year minimum sentence for using or carrying a firearm under § 924(c)(1)(A)(i). *Id.* The Supreme Court concluded, however, that "because the finding of brandishing increased the penalty to which the defendant was subjected, it was an element, which had to be found by the jury beyond a reasonable doubt. *Id.* at 117.

conviction did not need to be alleged in the indictment or submitted to the jury and proved beyond a reasonable doubt. *Alleyne,* 570 U.S. at 111 n.1.

The Florida First DCA rejected this claim on the merits on direct appeal, citing *Williams v. State*, 143 So.3d 423, 424 (Fla. 1st DCA 2014). ECF No. 17-4 at 185.  In *Williams*, the First DCA held that "[t]he key fact pertinent to PRR sentencing—whether the defendant committed the charged offense within three years of release from prison—is not an ingredient of the charged offense. Rather, it relates to the fact of a prior conviction. Accordingly, we hold that *Alleyne* does not require a jury to make the PRR factual determination." 143 So. 3d at 424 (citing *Lopez v. State*, 135 So. 3d 539 (Fla. 2d DCA 2014)).

Neither Petitioner nor Respondent address the fact that prior to trial Petitioner stipulated that: (1) Prior to July 6, 2012 (the date of the current offense), Petitioner had been convicted of a felony in Florida; and (2) Petitioner was released from the Department of Corrections for that offense on March 14, 2011, less than three years before the current offense.  ECF No. 17-1 at 97-98.  These are the salient facts that made Petitioner eligible for sentencing as a PRR.  In view of Petitioner's stipulations, it is questionable whether *Apprendi* was violated even if the prior-conviction exception did not apply.  *See Myles v. Sec'y, Fla. Dept. of Corr.,* No. 4:17-

cv-326-RH/GRJ, 2019 WL 968880 *3 (N.D. Fla. 2019) (unpublished)[7]

(questioning whether *Apprendi* was violated when the State at sentencing

proffered a DOC log establishing Petitioner's release date and Petitioner

did not object) (citing *United States v. Booker*, 543 U.S. 220, 244 (2005))

("[W]e reaffirm our holding in *Apprendi*: Any fact (other than a prior

conviction) which is necessary to support a sentence exceeding the

maximum authorized by the facts established by a plea of guilty or a jury

verdict *must be admitted by the defendant* or proved to a jury beyond a

reasonable doubt.") (emphasis added)).  In this case, the necessary facts

were admitted by Petitioner before trial pursuant to his stipulations.  ECF

No. 17-1 at 97-98.

Even if Petitioner did not stipulate to the relevant facts, he would not

be entitled to federal habeas corpus relief because the First DCA's decision

is not contrary to or an unreasonable application of clearly established

federal law. The First DCA's implicit conclusion that the *Apprendi* prior-

conviction exception applies to the date of a defendant's release from

custody on a prior conviction is "fairly debatable" among reasonable jurists

and, consequently, it is not "objectively unreasonable." *See Harrington*, 562

U.S. at 101 (holding that a "state court's determination that a claim lacks

---

[7] Pursuant to 11th Cir. R. 36-2, unpublished opinions are not considered binding
precedent but may be cited as persuasive authority.

merit precludes federal habeas relief so long as 'fairminded jurist could disagree' on the correctness of the state court's decision") (quoting *Yarbrough v. Alvarado,* 54–1 U.S. 652, 664 (2004)); *see Meders v. Warden, Ga. Diagnostic Prison*, 911 F.3d 1335, 1351 (11th Cir.), *cert. denied*, ___ U.S. ___, 140 S. Ct. 394 (2019).  This Court and other federal courts have concluded that the *Apprendi* prior-conviction exception applies to the date of a defendant's release from custody for PRR sentencing purposes.  *See Hackley v. Inch*, No. 4:17-cv-435-WS/CAS, 2019 WL 1548583, at *15 (N.D. Fla. Jan. 28, 2019) (fact of release from custody is subsumed within the prior conviction exception in *Apprendi*), *report and recommendation adopted by* 2019 WL 1548575 (N.D. Fla. April 9, 2019) (unpublished); *Jossey v. Sec'y, Dep't of Corr.,* No. 3:18-cv-464-J-39-JBT 2020 WL 2512819 *8 (M.D. Fla. May 14, 2020) (unpublished); *McGriff v. Sec'y, Dep't of Corr.*, No. 3:15-cv-1281-J-39-JBT, 2018 WL 354956, at *6 (M.D. Fla. Jan. 10, 2018) ("the fact that Petitioner committed his offenses within three years of being released from the FDOC is analogous to the fact of a prior conviction as it demonstrates recidivism") (unpublished).

With respect to the date of the current offense, Petitioner was charged with an offense on or about a specific date, July 6, 2012.  ECF No. 17-1 at 95-96 (Second Amended Information). The jury verdict necessarily determined that he committed the offense on or reasonably near that date.

When a fact at issue is determined by a jury on proof beyond a reasonable doubt, there is no *Apprendi* violation.  *See Myles,* 2019 WL 968880 *3.

Accordingly, Petitioner has not established that the state court's rejection of his *Apprendi/Alleyne* claim regarding his PRR sentence is contrary to, or an unreasonable application of federal law.  He is therefore not entitled to habeas corpus relief on this claim.  § 2254(d)(1); *see Burt*, 571 U.S. at 18-19.

**Ground Two: Whether the PRR Sentence is Unconstitutional Because Neither Petitioner's Status as a PRR Nor the State's Intention to Seek an Enhanced Sentence were Timely Alleged in the Charging Document**

Petitioner contends that the State was required to allege his status as a PRR and its intention to seek enhanced sentencing in his Second Amended Information, relying on *Apprendi, Alleyne,* and *Jones v. United States,* 526 U.S. 227 (1999).  ECF No. 7 at 9.  The First DCA rejected this claim on the merits, citing *Williams*, 143 So. 3d 423.[8]

First, it is again notable that Petitioner stipulated to the sentencing factors that he contends should have been alleged in the charging document, and

---

[8] *Williams* does not specifically address the issue whether the State's intention to seek a PRR sentence must be charged in the information.  The First DCA's decision is nevertheless considered an adjudication of the claim on the merits absent any indication that the issue was decided on independent procedural grounds.  *See Harrison,* 562 U.S. at 98 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

thereby arguably waived any argument that those factors should have been in the charging document.  *See* ECF No. 17-1 at 97-98.

Second, in view of the determination that the state court could reasonably conclude that *Apprendi* and *Alleyne* do not apply to Petitioner's PRR sentence, it follows that the State was not required to allege Petitioner's PRR status and its intent to seek enhanced sentencing in the charging instrument.  The First DCA expressly rejected this same claim in *State v. Culp,* 141 So.3d 279 (Fla. 1ˢᵗ DCA 2014), as follows:

> Culp argues that his PRR sentence is unconstitutional under [*Alleyne*] because the predicate facts for the sentence were not alleged in the information or found by a jury. We affirm this issue based upon *Williams v. State,* 143 So.3d 423 (Fla. 1st DCA 2014), and *Lopez v. State,* 135 So.3d 539 (Fla. 2d DCA 2014). *See also Almendarez–Torres v. United States,* [523 U.S. at 243] (explaining that the charging document need not allege facts "relevant only to the sentencing of an offender found guilty of the charged crime" and stating that "the Court said long ago that a State need *not* allege a defendant's prior conviction in the indictment or information that alleges the elements of an underlying crime") (emphasis in original).

*Culp*, 141 So.3d 1279.

This Court on habeas review has likewise rejected the same claim. *See, e.g., Ross v. McNeil*, No. 5:07-cv-219-RS/EMT, 2010 WL 2179039 at *41 (N.D. Fla. Apr. 14, 2010), *report and recommendation adopted,* 5:07-cv-219-RS/EMT, 2010 WL 2179037 (N.D. Fla. May 28, 2010) (unpublished).  In *Ross,* the court observed that "'recidivism . . . is a traditional, if not the most traditional, basis for a sentencing court's

increasing an offender's sentence.'" *Id.* (quoting *Almendarez-Torres,* 523 U.S. at 243). *Ross* concluded that "the fact that Petitioner committed the instant offense within three years after being released from prison is analogous to the fact of a prior conviction because it demonstrates Petitioner's recidivism," and therefore the petitioner was not entitled to federal habeas relief on his claim that the PRR sentencing factors must be alleged in the charging instrument. *Ross,* 2010 WL 2179039 at *41.[9]

Petitioner has failed to show that the state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established Federal law, and therefore he is not entitled to habeas corpus relief. § 2254(d)(1); *see Burt*, 571 U.S. at 18-19.

### Ground Three: Ineffective Assistance for Failing to Argue Against the Jury Instruction and Verdict Form Allowing Petitioner to be Found Guilty as a "Principal"

Petitioner contends that the evidence adduced at trial did not support the State's theory that he could be found guilty as a principal to armed robbery. As support for this claim, Petitioner contends that "there was no testimony presented that would justify the principal jury instruction as all

---

[9] Petitioner cites *Jones v. United States,* 526 U.S. 227 (1999) as support for this claim, but *Jones* is inapposite. In *Jones,* the Supreme Court concluded that provisions of a carjacking statute that established higher penalties to be imposed when the offense resulted in serious bodily injury or death set forth additional elements of offense, not mere sentencing factors. *Jones,* 526 U.S. at 229.

witnesses testified that [Petitioner] was the only participant with a firearm,

and that he personally fired the shot into the bedroom."  ECF No. 7 at 14.

The state postconviction court denied this claim, concluding as

follows:

> As to Ground 1, Defendant alleges that trial counsel was
> ineffective for "failing to argue against the inclusion of the 'principal
> theory' jury instruction, and trial court's changing of the verdict form to
> accommodate the principal theory, when no testimony or evidence
> supported the instruction." "The principal instruction may be given if
> the evidence adduced at trial supports such an instruction." *McGriff v.
> State*, 12 So.3d 894, 895 (Fla. 1st DCA 2009)(citing *Masaka v. State*,
> 4 So.3d 1274, 1284 (Fla. 4th DCA1997); *Thomas v. State*, 617 So.2d
> 1128, 1128 (Fla. 3d DCA 1993)). "If there is no evidence that would
> support the principals theory, then the reading of the instruction is
> error." *Id.* In order for the principal theory to apply, (1) the defendant
> must have intended for the offense to be committed; and, (2) the
> defendant must have assisted in the commission of the offense.
> *McBride v. State*, 7 So.3d 1146, 1148 (Fla. 2d DCA 2009)(citing
> *Acord v. State*, 841 So.2d 587, 589 (Fla. 2d DCA 2003)); *see also
> Watkins v.* State, 826 So.2d 471, 474 (Fla. 1st DCA 2002)("To be
> guilty as principal to a crime physically committed by another, one
> must intend that the crime be committed and do some act to assist
> the other person in actually committing the crime.").

> Here, there was substantial evidence that Defendant intended
> for the armed burglary to occur; and, assisted in the commission of
> the offense. *See* Trial Transcript at 82 (lines 7-25) - 90 (lines 1-9),
> 140 (lines 14-25) - 181 (lines1-8), 187 (lines 4-25) - 225 (lines 1-11).
> Thus, it was appropriate for the "principals" jury instruction to be
> given. For this reason, Defendant fails to show either error by counsel
> or prejudice. Accordingly, the claim raised is without merit.

ECF No. 17-4 at 353, 17-5 at 1-7.

The First DCA affirmed the summary denial of this claim without

explanation.  Absent evidence to the contrary, this Court may presume that

the First DCA adopted the rationale of the postconviction court.  *Wilson v. Sellers,* 138 S. Ct. 1188, 1192 (2018) (federal court on habeas review "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.").

The trial court instructed the jury on the elements of burglary while armed under Florida law, explaining that "[t]o arm oneself during the course of a burglary includes possessing a firearm, whether loaded with ammunition or not, at any time during the course of committing the burglary."  ECF No. 17-2 at 198-99; *see* Fla. Stat. § 810.02(2)(b).  The parties agreed during the charge conference that the "principals" instruction applied based on the evidence, and the trial court gave the standard Florida jury instruction on "principals".  ECF No. 17-1 at 102.  That instruction allowed the jury to find Petitioner guilty if he helped another person or persons commit a crime and (1) "had a conscious intent that the criminal act be done"; and (2) if Petitioner "did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually commit or attempt to commit the crime."  *Id.*

Counsel cannot be deemed deficient for failing to object to standard jury instructions that have not been invalidated by the Florida Supreme

Court.  *Rodriguez v. State*, 919 So. 2d 1252, 1272 (Fla. 2005); *Elledge v. State*, 911 So. 2d 57, 77 (Fla. 2005); *Rosado–Rodriguez* v. Sec'y, Dep't of Corr., No. 8:15–CV–1260–T–33AEP, 2016 WL 1305152, at *14 (M.D. Fla. Apr. 4, 2016) (unpublished) ("Failure to object to a standard jury instruction is not ineffective assistance of counsel.").  As summarized above, the trial evidence plainly supported giving the "principals" instruction.  Nobles' testimony was more than sufficient for a reasonable jury to find that Petitioner helped commit the burglary, had a conscious intent that the burglary be done, and encouraged the burglary by telling Nobles to throw a concrete block through the victim's door.  Petitioner contends that the evidence showed that he was the only person with a firearm and that he personally shot the firearm into the apartment, but that is not the only conclusion that could be drawn from the evidence.  Petitioner admitted to Ettinger that he hid the firearm in Johns' apartment, and the jury could find from the expert testimony that the same firearm was used in the burglary. But the only testimony that it was Petitioner himself who discharged the weapon came from Nobles.  A reasonable jury could have decided not to credit Nobles' testimony on that point, given that the physical evidence established only that the firearm which Petitioner admitted possessing at some point after the burglary was the one used during the offense.  The jury did not, in fact, make the affirmative findings that Petitioner himself was

in actual possession of a firearm and actually discharged a firearm.  But, as

the trial court noted at sentencing: "[t]here was a firearm fired in this case,

whether it was by [Petitioner] or one of his codefendants."  ECF No. 17-4 at

42.

On this record, Petitioner has failed to show that the state court's

rejection of this claim on both the performance and prejudice prongs of

*Strickland* was unreasonable.  Petitioner is not entitled to habeas relief on

this claim.

### Ground Four: Ineffective Assistance for Failing to Object to "Ambiguous" Verdict Form Which "Misled and Confused the Jury and Resulted in a Miscarriage of Justice"

Petitioner contends that the verdict form was ambiguous and

misleading, and that his counsel should have objected to the inclusion of

interrogatory 1E, which allowed the jury to find that he was guilty as a

"principal to burglary with actual possession of a firearm".  ECF No. 7.  The

First DCA affirmed the denial of relief on this claim without a written

opinion, but the postconviction court explained its rationale as follows:

> As to Ground 2, Defendant alleges that trial counsel was
> ineffective for "failing to object when the verdict form used to convict
> was ambiguous as a matter of law, misled and confused the jury, and
> resulted in a miscarriage of justice." During deliberations, the jury
> asked for clarification of paragraph 1.E. of the verdict form. The court
> subsequently explained to the jury that paragraph 1.E. applied if the
> jury believed that Defendant was a principal to the armed burglary.
> *See* Trial Transcript at 292 (lines 12-25) - 295 (lines 1-3). As a result
> of the court's response, the jury came back with a verdict of guilty,

with a finding that Defendant was a principal to the armed burglary. *See* Verdict.

Defendant is correct that paragraph 1.E. of the verdict form is poorly worded. However, even if counsel should have objected to the wording of the verdict form, Defendant fails to show prejudice because the verdict clearly reflects the jury's belief that Defendant did not physically commit the armed burglary, but was merely a principal to the offense. For this reason, there is not a reasonable probability that counsel's failure to object to the language paragraph 1.E. affected the outcome of the trial. Accordingly, the claim raised is without merit.

ECF No. 17-5 at 3-4.

Under Florida law, actual possession of a firearm by the defendant is not required to sustain a conviction for armed burglary under a "principals" theory. *See State v. Retalic*, 902 So. 2d 315, 316 (Fla. 2d DCA 1998); *Powell v. State*, 724 So. 2d 1207, 1207 (Fla. 5th DCA 2005).  As the postconviction court found, the verdict form was "poorly worded" in that it provided for a finding that Petitioner was guilty "as a principal to burglary with actual possession of a firearm", but the trial court clarified the meaning of the interrogatory for the jury.  In response to the jury's query, the trial court explained that interrogatories 1C and D required findings that Petitioner himself actually possessed a firearm during the burglary, while 1E applied if Petitioner acted as a "principal" in helping another person commit the crime.  ECF No. 17-2 at 216.  In view of the fact that the jurors did not find beyond a reasonable doubt that Petitioner himself actually

possessed the firearm during the burglary, the postconviction court concluded that it was clear the jury believed "that Defendant did not physically commit the armed burglary, but was merely a principal to the offense," and therefore Petitioner was not prejudiced by counsel's failure to object to the wording on the verdict form.  ECF No. 17-5 at 3-4.

Faced with a habeas petition making similar claims about asserted ambiguity in a verdict, the Eleventh Circuit recently reiterated that "'[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Smith v. Sec'y, Dept. of Corr.*, 800 Fed. Appx. 776, 779 (11th Cir. 2020) (unpublished) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).  In *Smith,* the Petitioner argued that his convictions for robbery with a firearm and carjacking with a firearm violated *Apprendi* because the trial court did not specifically instruct the jury that he could be found guilty of armed robbery and carjacking if *any* of the defendants carried a firearm during the offense.  The trial court had given an instruction on "principals" substantially like the one in this case. *See Smith,* 800 Fed. Appx. at *778.  The verdict form in *Smith* allowed the jury to find the defendant guilty of "robbery with a firearm" and "carjacking with a firearm", and included special interrogatories about whether the defendant himself "actually possessed" a firearm.  The jury found the

defendant guilty, but did not find that the he actually possessed a firearm.
*Id.*

The Eleventh Circuit held that the state court's denial of postconviction relief was not unreasonable.  The trial court had properly instructed the jury on the elements of armed robbery and armed carjacking.  Even though the jury's verdict form reflected that they did not find beyond a reasonable doubt that the defendant "actually possessed" a firearm, they had been instructed on the principals/aiding-and-abetting theory.  Florida "'punishes aiders and abettors the same as principal offenders.'"  *Smith,* 800 Fed. Appx. at 780  (quoting *Boston v. United States*, 939 F.3d 1266, 1271 (11th Cir. 2019)); *see* Fla. Stat. § 777.011 ("Whoever commits any criminal offense . . . , or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such.").  Thus, the Eleventh Circuit concluded:

> While we agree that the trial court could have done more to clarify how "actual[ ] possess[ion]" as used in the interrogatory differed from the standard applicable to the charged offenses, we cannot say that the denial of habeas relief was unreasonable. Although the jury ultimately found that Smith did not actually possess a firearm, the state post-conviction court reasonably concluded that the jury's finding on that matter did not undermine Smith's convictions or sentences because the jury was instructed on aiding-and-abetting liability.

*Smith*, 800 Fed. Appx. at *778.

In this case, the trial court instructed the jury on the elements of the charged offense ("burglary" under Fla. Stat. § 810.02), and then instructed the jury that "[I]f you find that [Petitioner] committed burglary, and you also find that during the commission of the crime he carried, displayed, used, threatened to use, or attempted to use a firearm, you should find him guilty of burglary with a firearm." ECF No. 17-1 at 101; ECF No. 17-2 at 199. The court then gave the instruction on "principals". ECF No. 17-2 at 200-01. As in *Smith*, the trial court arguably could have done more to clarify how "principal to a burglary with actual possession" in interrogatory 1E of the verdict form (ECF No. 17-1 at 111) "differed from the standard applicable to the charged offense" of burglary with a firearm. *Smith,* 800 Fed. Appx. at *781. But in rejecting Petitioner's ineffective-assistance claim, the postconviction court concluded that despite the verdict form's shortcomings "the verdict clearly reflects the jury's belief that [Petitioner] did not physically commit the armed burglary, but was merely a principal to the offense. For this reason, there is not a reasonable probability that counsel's failure to object to the language paragraph 1.E. affected the outcome of the trial." ECF No. 17-5 at 3-5.

The record reasonably supports the state court's decision that

Petitioner was properly convicted of and sentenced as a principal to armed robbery and that counsel's performance regarding the wording of the verdict form did not prejudice Petitioner.  On this record, Petitioner has not established "'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Richter*, 562 U.S. at 103.  Giving due deference to the state court's decision, Petitioner has not shown that this claim presents a basis for federal habeas relief.  *See Smith,* 800 Fed. Appx. at *781–82.

### Ground Five: Ineffective Assistance Regarding Hearsay Testimony Referring to  Tameka Johns' Statements

Petitioner contends that his trial counsel rendered ineffective assistance for failing to exclude Ettinger's "hearsay" testimony about Tameka John's statements and for failing to object to the State's opening argument in which the prosecutor referenced those statements.  ECF No. 7 at 20-24.  Petitioner also contends that his trial counsel should have objected to the prosecutor's closing argument in which he stated that Johns told Ettinger things "that only somebody who knows about the burglary would know.  And she gets that information because she's the defendant's girlfriend.  She's the mother of the defendant's child."  ECF No. 24 at 17.

In rejecting this claim on postconviction review, the state court reasoned as follows:

As to Ground 3, Defendant alleges that trial counsel was ineffective for failing to file a motion in limine and/or motion for mistrial and/or properly object; failing to prevent hearsay testimony referring to Tameka Johns' police interviews; and, failing to object to the State's opening statement referring to statements made by Tameka Johns who did not testify. Much of what Defendant argues was hearsay was not hearsay. *See Mense v. State*, 570 So.2d 1390, 1392 (Fla.3d DCA 1990)("A police officer may testify as to what he did pursuant to information he received from others; however, he may not testify as to the information itself if the information is hearsay). As the court noted at trial, the testifying officer was allowed to indicate that he received information from Ms. Johns; that he developed suspects based on this information; and, what he did based on the information that he received. *See* Trial Transcript at 84 (lines 21-24). Regardless, pursuant to the request of defense counsel, the court did advise the jury as how to consider the out-of-court statements of Ms. Johns:

> Ladies and gentlemen, the court wishes to instruct you at this point that you understand clearly that any information or statements made to the detective by a third party who's not before you should not be received for the truth of the matter, this is, not evidence of anything, but, rather, merely to explain the actions of the officer in terms of what he did and why, and so he may testify as to that. But statements made are, indeed -- that may have been made to him are hearsay otherwise and would not be admissible in terms of as evidence for you.

*Id.* at 85 (lines 8-18). When the State did begin to elicit hearsay statements, the court reined them back in. *Id.* at 189 (lines 2-25) – 190 (line 1). The court also, pursuant to the request of defense counsel, again advised the jury as how to consider the out-of-court statements of Ms. Johns:

> Ladies and gentlemen, once again, I remind you that the statements made by individuals out of court to the detective are hearsay statements, and whatever information may be supplied is not offered through the detective for the truth of the matter of those statements but to explain the actions of the detective, in other words, why he was doing what he did, to explain his actions, but not for the truthfulness of any of the statements

made by a third party to him.

*Id.* at 190 (lines 2-16). As the statements of Ms. Johns were elicited, the court continued to closely monitor their admissibility. *Id.* at 202 (lines 5-25) - 204 (lines 1-4). This Court additionally notes that: (1) Defendant's co-defendant Johnny Nobles testified at trial and implicated Defendant in the armed burglary; (2) Defendant admitted to law enforcement to being with his co-defendants on the night of the burglary; and (3) Defendant admitted to law enforcement that the recovered firearm used in the armed burglary was his. *Id.* at 140-181, 192 (lines 10-25 - 199 (lines 1-5). Thus, even if some hearsay was elicited, Defendant fails to show a reasonable probability that it affected the outcome of the trial.

As for the State's opening statement, the State was merely explaining how law enforcement came to investigate the defendants in this case. As previously indicated, the source of their lead was Tameka Johns, who was Defendant's girlfriend. *Id.* at 19 (lines 1-25) - 20 (lines 1-22). Although the fact that Defendant has Ms. Johns' name tattooed on his leg did not come out at trial, there was undisputed testimony that she was his girlfriend. *Id.* at 144 (lines 21-24), 187 (lines 11-16). Thus, even if counsel should have objected to the tattoo comment, Defendant fails to show a reasonable probability that it affected the outcome of the trial.

For the foregoing reasons, the claim raised is without merit.

ECF No. 17-5 at 4-5.

The state court implicitly determined that counsel was not ineffective with respect to Johns' statements.  As the state court explained, and as described in this Court's summary of the trial testimony, *supra,* Petitioner's counsel did interpose objections during the testimony about Tameka Johns' statements to law enforcement.  At defense counsel's behest, the trial court twice instructed the jury during the trial about how to consider the out-of-

court statements attributed to Johns.  Counsel objected again during the

prosecutor's closing argument when he referred to Johns providing

information to law enforcement "that only somebody who knows about the

burglary would know", but the court overruled his objection.  ECF No. 17-2

at 167.  Given that counsel objected to the statements and succeeded in

having the trial court explicitly instruct the jury on the treatment of such

statements, the postconviction court's implicit determination that counsel

did not perform deficiently is reasonable.

Moreover, the postconviction court explicitly determined that

Petitioner's ineffective-assistance claim fails on the prejudice prong of

*Strickland*.  If a claim of ineffective assistance of counsel can be resolved

through one of the *Strickland* test's two prongs, the other prong need not

be considered.  *Strickland,* 466 U.S. at 697 ("[T]here is no reason for a court

deciding an ineffective assistance claim ... to address both components of

the inquiry if the defendant makes an insufficient showing on one."); *Sims*

*v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998) ("When applying

*Strickland*, we are free to dispose of ineffectiveness claims on either of its

two grounds.").

A petitioner must affirmatively prove prejudice that would undermine

the results of the proceedings because "attorney errors come in an infinite

variety and are as likely to be utterly harmless in a particular case as they

are to be prejudicial. That the errors had some conceivable effect on the outcome of the proceeding is insufficient to show prejudice." *Butcher v. United States*, 368 F.3d 1290, 1293 (11th Cir. 2004) (citations and internal quotations omitted). Indeed, the court must examine the entirety of counsel's performance and the effect of such "in light of the record as a whole to determine whether it was reasonably probable that the outcome would have been different." *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." *Osley v. United States*, 751 F.3d 1214, 1222 (11th Cir. 2014).

On the prejudice prong, the postconviction court concluded that even if "some hearsay was elicited", there was no reasonable probability that the outcome of the trial was affected considering that: (1) Nobles' testimony directly implicated Petitioner in the armed burglary; (2) Petitioner admitted to law enforcement that he was with the co-defendants on the night of the burglary; and (3) Petitioner admitted to law enforcement that the firearm recovered from Johns' apartment was his. ECF No. 17-5 at 4-5.

Based on this Court's review of the record, and mindful of the deference afforded to the state court's decision, Petitioner has not established that the rejection of this claim on the prejudice prong of *Strickland* reflects "an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.  Petitioner is therefore not entitled to habeas corpus relief on this claim.

## IV.  Certificate of Appealability

Section 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

Rule 11(a) also provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

## V. <u>Conclusion</u>

For the foregoing reasons it is respectfully **RECOMMENDED** that the

Petition for Writ of Habeas Corpus, ECF No. 7, should be **DENIED**, and

that a certificate of appealability should be **DENIED**.

**IN CHAMBERS** this 4th day of August 2020.

*s/Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**